IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE APPLICATION OF THE NEW YORK TIMES COMPANY IN THE MATTER OF REP. ILHAN OMAR INVESTIGATION | N<br>C | Case: 1:26-mc-00145<br>Assigned To : Boasberg, James E.<br>Assign. Date : 10/15/2026<br>Description: Misc. |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE NEW YORK TIMES COMPANY'S MOTION TO INTERVENE AND APPLICATION FOR ACCESS TO SEALED SEARCH WARRANT RECORDS**

RECEIVED

OCT 15 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 3

A. The White House Publicly Revealed that Rep Omar Was Under Investigation Before the October 12, 2026 Raid on Her Home ........ 3

B. The Search Warrant and the October 12, 2026 Search of Ms. Omar's Home ........ 4

C. The Public Response to the Search of Rep. Omar's Home ........ 6

ARGUMENT ........ 8

I. THE COURT SHOULD PERMIT THE TIMES TO INTERVENE FOR THE LIMITED PURPOSE OF SEEKING ACCESS TO THE SEALED RECORDS ........ 8

II. THE COMMON LAW RIGHT OF ACCESS REQUIRES THE SEARCH WARRANT RECORDS TO BE UNSEALED ........ 9

A. The Common Law Right of Access Applies to the Search Warrant Records ........ 10

B. The *Hubbard* Factors Mandate Disclosure of the Search Warrant Records ........ 10

III. THE FIRST AMENDMENT RIGHT OF ACCESS REQUIRES THE SEARCH WARRANT RECORDS TO BE UNSEALED ........ 14

A. The First Amendment Right of Access Applies to the Search Warrant Records ........ 14

B. There Are No Compelling Intereests That Override the First Amendment Right of Access to the Search Warrant Records ........ 16

CONCLUSION ........ 18

## TABLE OF AUTHORITIES

**Cases**

*Baltimore Sun Co.v. Goetz*, 886 F.2d 60 (4th Cir. 1989) ... 15
*Buckley v. Valeo*, 424 U.S. 1 (1976) ... 12
*CNN v. FBI*, 984 F.3d 114 (D.C. Cir. 2021) ... 14
*Doe v. Pub. Citizen*, 749 F.3d 246, 271 (4th Cir. 2014) ... 11
*EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042 (D.C. Cir. 1998) ... 8
*Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989) ... 2
*Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 609 n.25 (1982) ... 8, 9, 16
*Hyatt v. Lee*, 251 F. Supp. 3d 181, 184 (D.D.C 2017) ... 11
*In re Application of Chodiev*, 2021 U.S. Dist. LEXIS 90103 (D.D.C. Mar. 23, 2021) ... 9
*In re Application of L.A. Times Commc'ns to Unseal Ct. Records*, 628 F. Supp. 3d 55, 66 (D.D.C. 2022) ... 13, 14
*In re Application of Newsday, Inc.*, 895 F.2d 74 (2d Cir. 1990) ... 16
*In re Application of WP Co.*, 201 F. Supp. 3d. 109 (D.D.C. 2016) ... 10
*In re Boston Herald, Inc.*, 321 F.3d 174 (1st Cir. 2003) ... 10
*In re Leopold*, 300 F. Supp. 3d. 61, (D.D.C. 2018) ... 11
*In re McClatchy Newspapers, Inc.*, 288 F.3d 369 (9th Cir. 2002) ... 17
*In re Motion to Intervene & Unseal Search Warrant Records*, 2025 U.S. Dist. LEXIS 178461, at *4 (D. Md. Sept. 12, 2025) ... 16, 17
*In re N.Y. Times*, 585 F. Supp. 2d 83 (D.D.C. 2008) ... *passim*
*In re Press Application for Access to Jud. Recs. in Case No. 23-SC-31*, 704 F. Supp. 3d 161 (D.D.C. 2023) ... 11
*In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325 (D.C. Cir. 1985) ... 2
*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569 (8th Cir. 1988) ... 15
*In re Search Warrant*, 2000 WL 1196327 (D.D.C. July 24, 2000) ... 10
*In re Special Proceedings*, 842 F. Supp. 2d 232 (D.D.C. 2012) ... 17
*In re Warrant*, 622 F. Supp. 3d 1257 (S.D. Fla. 2022) ... 17
*In re: Search Warrants Issued on May 21, 1987*, 1990 U.S. Dist. LEXIS 9329 (D.D.C. July 26, 1990) ... 10

*L.A. Times Commc'ns v. U.S.*, 28 F.4th 292 (D.C. Cir. 2022) ........ 13
*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d. Cir. 1989) ........ 2
*Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661 (D.C. Cir. 2017) ........ 11
*Mills v. Alabama*, 384 U.S. 214 (1966) ........ 12
*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971) ........ 12
*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ........ 18
*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978) ........ 10
*Press-Enterprise Co. v. Super. Ct.*, 464 U.S. 501 (1984) ........ 16
*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ........ 14
*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ........ 9
*Sealed Search Warrants Issued June 4 & 5, 2008*, 2008 U.S. Dist. LEXIS 107711 (N.D.N.Y. July 14, 2008) ........ 17
*Search Warrant Dated October 13, 2023*, 2023 U.S. Dist. LEXIS 188837 (S.D.N.Y. Oct. 20, 2023) ........ 13, 17
*Times Mirror Co. v. U.S.*, 873 F.2d 1210 (9th Cir. 1988) ........ 14
*U.S. v. All Assets Held at Bank Julius Baer & Co.*, 520 F. Supp. 3d 71 (D.D.C. 2020) ........ 11
*U.S. v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) ........ 8
*U.S. v. El-Sayegh*, 131 F.3d 158 (D.C. Cir. 1997) ........ 14
U.S. v. Hubbard, 650 F.2d 293 (D.C. Cir. 1980) ........ 10, 11
*U.S. v. Loughner*, 769 F. Supp. 2d 1188 (D. Ariz. 2011) ........ 17
*Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897 (D.C. Cir. 1996) ........ 9, 10
*Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) ........ 14, 16

**Statutes**

Fed. R. Crim. P. 41(i) ........ 14

The New York Times Company ("The Times") respectfully moves to intervene in this action for the limited purpose of seeking access to judicial records that are sealed or have otherwise not been made publicly available.

## PRELIMINARY STATEMENT

The presumption of openness that governs all judicial proceedings applies with special force to this extraordinary case in which federal agents have executed a search warrant on Rep. Ilhan Omar, a sitting Congresswoman, 22 days before the midterm elections. The executive branch has conducted its investigation with a conspicuous lack of secrecy. In March 2026, Vice President J.D. Vance told a podcaster that Rep. Omar "definitely committed election fraud" and revealed that he had discussed "how to go after her, how to investigate her, [and] how to build a case" with White House Deputy Chief of Staff of Policy Steven Miller. Federal agents raided Rep. Omar's home on the morning of October 12, 2026, roughly three weeks before the midterms, even though the Department of Justice has a policy against taking overt actions against a candidate within 60 days of an election. News cameras stationed outside of Rep. Omar's house broadcast the search. President Trump and high-profile members of his administration confirmed that a criminal investigation into Rep. Omar was underway. And, for her part, Rep. Omar posted a statement on social media denouncing the investigation as "the latest escalation in [a] campaign of political intimidation," adding that she "will not be silenced."

Yet while all of this transpires in the open, the public remains in the dark about the judicial process that culminated in the historic raid on Rep. Omar's home: the underlying search warrant, transcripts and other key documents remain under seal. The Times does not even know the full scope of the judicial documents pertaining to the warrant. This lack of transparency is particularly

intolerable in the run-up to an election in which Rep. Omar is running to retain her seat, and in which her party is fighting for Congressional majorities.

Through this motion, The Times seeks an order unsealing judicial materials filed as part of this investigation—including, but not limited to, all versions of the search warrant, the warrant application, the warrant return, any sealing application, all supporting affidavits, any transcripts of proceedings before this Court, and any other records filed with this Court in connection with this search warrant (collectively, the "Search Warrant Records"). It is clear from public descriptions of the case, including statements by prominent executive branch officials, that the federal common law and the First Amendment independently require the immediate unsealing of these records. *See e.g.*, *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1347 (D.C. Cir. 1985) (Wright, J., concurring in part and dissenting in part) ("[T]he First Amendment provides a presumptive right of contemporaneous access . . . ."); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d. Cir. 1989) ("Our public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found.") (citations omitted); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989) ("[E]ven a one to two day delay impermissibly burdens the First Amendment . . . ."). Here, the need for expedient access to these records cannot be overstated. Release of the Search Warrant Records will shed light on the propriety of the ongoing investigation into Rep. Omar, which is the subject of fierce political debate, and is urgently needed to inform voters in her Minnesota district as well as the American public at large. And no countervailing factors can justify blanket sealing, including the fact that the investigation into Rep. Omar is ongoing.[1]

[1] Neither Rep. Omar nor the government responded to emails from The Times requesting their position with respect to this access motion.

## FACTUAL BACKGROUND

### A. The White House Publicly Revealed that Rep. Omar Was Under Investigation Before the October 12, 2026 Raid on Her Home

For many years, President Trump has publicly questioned Rep. Omar's right to remain in America. In 2019, he tweeted that Rep. Omar and three other members of Congress should "go back and help fix the totally broken and crime infested places from which they came."[2] President Trump has frequently attacked Rep. Omar for her Somali heritage.[3] In late 2025, White House Border Czar Tom Homan told Newsmax that the administration did not move forward with a previous investigation of Rep. Omar due to statute of limitations issues.[4] But, Mr. Homan said, he had no doubt that Rep. Omar committed fraud and his investigators had restarted their investigation into her immigration files.[5]

In March 2026, the conservative commentator Benny Johnson posted an interview with Vice President J.D. Vance in which Vance stated that "we think that Ilhan Omar definitely committed immigration fraud against the United States of America."[6] He added that he had spoken with Deputy Chief of Staff of Policy Steven Miller "recently and we're trying to look at what the remedies are . . . now that we know she's committed immigration fraud. How do you go after her,

---

[2] Bianca Quilantan and David Cohen, *Trump Tells Democratic Congresswomen: Go Back Where You Came From*, POLITICO (July 14, 2019, 9:15 AM), https://www.politico.com/story/2019/07/14/trump-congress-go-back-where-they-came-from-1415692.

[3] *See, e.g.*, Nicholas Kerr, Emily Chang, & Michelle Stoddart, *Trump Again Attacks Rep. Ilhan Omar, a U.S. Citizen, Over Immigration Allegations*, ABC NEWS (October 13, 2026, at 2:50 PM), https://abcnews.com/Politics/trump-blasts-rep-ilhan-omar-position-us-citizen/story?id=137218882.

[4] Devlin Barrett, Hamed Aleaziz, Ernesto Londoño, & Alan Feuer, *Homeland Security Agents Search Home of Rep. Ilhan Omar*, N.Y. TIMES (Oct. 12, 2026), https://www.nytimes.com/2026/10/12/us/politics/ilhan-omar-home-searched.html.

[5] *Id.*

[6] Matt Shuham, *Ilhan Omar Says She Will Not Be Silenced After Federal Agents Raid Her Home*, THE GUARDIAN (Oct. 12, 2026, 12:20 AM), https://www.theguardian.com/us-news/2026/oct/12/federal-agents-ilhan-omar-home-raid.

how do you investigate her, how do you actually build the case to get justice for the American people?"[7] In addition to immigration fraud, Vice President Vance asserted that Rep. Omar should also be investigated for being "at the center of some of the worst fraudsters in the Somali community." [8]

In September 2026, Homeland Security Secretary Markwayne Mullin confirmed that there was an "ongoing investigation" into potential fraud on immigration paperwork completed by Rep. Omar's family.[9] Secretary Mullin asserted that "something's going to happen."[10]

On October 10, 2026, two days before the raid, President Trump told the crowd at a political rally in Tennessee that "our people are looking at [Rep. Omar] very strongly" and "let's see what happens."[11]

### B. The Search Warrant and the October 12, 2026 Search of Ms. Omar's Home

As The Times reported, prosecutors applied for a search warrant in this Court more than a week before the raid on Rep. Omar's house took place on October 12, 2026.[12] According to a source with knowledge of the proceedings, the search warrant was the subject of significant back and forth between prosecutors and the federal judge who eventually approved it.[13] The search

[7] Alanna Durkin Richer, *Federal Agents Search Rep. Ilhan Omar's Home as Part of a Criminal Investigation*, PBS (Oct. 12, 2026, 10:31 AM), https://www.pbs.org/newshour/amp/politics/ap-report-federal-agents-search-rep-ilhan-omars-home-as-part-of-a-criminal-investigation.

[8] Jeff Wald, *J.D. Vance: Ilhan Omar 'Definitely Committed Immigration Fraud,'* FOX9 MINNEAPOLIS (March 29, 2026, 8:53 PM), https://www.fox9.com/news/jd-vance-ilhan-omar-immigration-fraud.

[9] Nicholas Riccardi, *What to Know About the Search of Democratic Rep. Omar's Home*, PBS (Oct. 13, 2026, 3:19 PM), https://www.pbs.org/newshour/politics/what-to-know-about-the-search-of-democratic-rep-omars-home.

[10] *Id.*

[11] Shuham, *supra* n.5.

[12] Barrett et al., *supra* n.3.

[13] *Id.*

warrant was not signed until constitutional issues surrounding Rep. Omar's status as a member of Congress were resolved, including problems arising under the speech or debate clause.[14]

The Times also reported that the final version of the search warrant listed a series of potential immigration crimes under investigation, including the making of false statements and fraud in immigration paperwork, as well as a general conspiracy charge.[15] The Times is unable to locate the docket for these proceedings and understands that the search warrant—together with any supporting affidavits, transcripts and other related materials—remain under seal.

In the early morning of October 12, 2026, federal agents from Homeland Security Investigations raided Rep. Omar's home in Washington, D.C.[16] News reporters were present at the scene, where they filmed agents carrying boxes of evidence away and broadcast that footage to the public.[17]

The search took place 22 days before the upcoming November 5, 2026, midterm elections.[18] The chapter of the Justice Manual on Protection of Government Integrity prohibits "the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election…."[19] The Department of Justice has interpreted this regulation to mean that it should avoid taking overt activity—such as an observable search of their home or business—

---

[14] *Id.*

[15] *Id.*

[16] Nicole Sganga, *Rep Ilhan Omar's D.C. Home Searched by Homeland Security Investigators*, CBS News (Oct. 12, 2026, 7:55 PM), https://www.cbsnews.com/news/ilhan-omar-immigration-raid-washington-dc/.

[17] *Id.*

[18] Barrett et al., *supra* n.3.

[19] 9-85.500 Actions that May Have an Impact on an Election, *Justice Manual on Protection of Government Integrity*, https://www.justice.gov/jm/jm-9-85000-protection-government-integrity.

against a candidate for office during the 60-day period absent special circumstances, such as the risk of evidence spoliation or danger to individuals.[20]

### C. The Public Response to the Search of Rep. Omar's Home

On the day of the raid, a Justice Department spokesman confirmed in a statement that HSI agents had executed a judicially authorized search warrant as "part of an ongoing federal criminal investigation."[21] The U.S. Attorney of the District of Columbia subsequently confirmed that Representative Omar is under federal investigation in both Washington and Minnesota for alleged immigration fraud and potential inflation of her net worth.[22]

Katie Miller, the prominent conservative podcaster who is also married to Deputy Chief of Staff Stephen Miller, posted the comment, "[p]romise made, promise kept" on X next to a breaking news article reporting that Rep. Omar's house had been searched.[23] The post, which was quickly deleted, appeared to refer to the Trump Administration delivering on its prior threats about targeting Rep. Omar for prosecution.[24]

President Trump also made public statements about the raid on the day it happened.[25] He denied any involvement in the judicial proceedings but acknowledged that investigators had been

---

[20] *See* Jack Goldsmith, *What Does the 60-Day Rule Require?*, LAWFARE (Oct. 15, 2024, 12:00 PM), https://www.lawfaremedia.org/article/what-does-the-60-day-rule-require; Ana Radelat, *Federal Raid on Rep. Ilhan Omar's Home Raises Plenty of Questions*, MINNPOST (Oct. 12, 2026), https://www.minnpost.com/national/washington/2026/10/federal-raid-on-rep-ilhan-omars-home-raises-plenty-of-questions/.

[21] Barrett et al., *supra* n.3.

[22] Josh Christenson, *Rep. Ilhan Omar Investigated in D.C., Minnesota Over Inflating Net Worth, Immigration Fraud*, NEW YORK POST (Oct. 14, 2026, 11:47 AM), https://nypost.com/2026/10/14/us-news/rep-ilhan-omar-investigated-in-dc-minnesota-over-inflating-net-worth-immigration-fraud-sources/.

[23] Vic Verbalaitis, *Katie Miller Quickly Deletes Post Exposing Truth Behind Shocking Raid*, THE DAILY BEAST (Oct. 12, 2026, 12:00 PM), https://www.thedailybeast.com/katie-miller-quickly-deletes-post-exposing-truth-behind-shock-ilhan-omar-ice-raid.

[24] *Id.*

[25] Shuham, *supra* n.5.

"looking at [Rep. Omar] very carefully," adding that he "always found her to be totally crooked personally" and "a terrible person."[26] Later that evening, at an electoral rally in Ohio, President Trump referenced the raid again and his crowd repeatedly chanted "deport."[27]

Vice President Vance also issued public statements in the aftermath of the raid, stating that he had no direct involvement and that the investigation "would follow the facts."[28]

Commenting on the "unprecedented" nature of the search, Vice President Vance said that "Ilhan Omar is a very unprecedented person. We have very rarely had a person in Congress who seems to have such disdain and such rage at the country that gave her a better life. Now that's not a crime, but we're going to see if she did commit a crime. And, if she did, we're going to follow the law."[29]

On October 12, 2026, Rep. Omar posted the following message on X: "I'm ok. Make no mistake: this is an attempt to target political enemies and weaponize federal law enforcement. For ten years, Trump has targeted me with baseless lies and smear campaigns. This is just the latest escalation in his campaign of political intimidation. I will not be silenced."[30]

---

[26] *Id.*

[27] *Id.*

[28] Ernesto Londoño, Alan Feuer, & Devolin Barrett, *Justice Dept. Issues Subpoenas in Ilhan Omar Investigation*, N.Y. TIMES (Oct. 13, 2026), https://www.nytimes.com/2026/10/13/us/politics/justice-dept-ilhan-omar-subpoenas.html.

[29] Peter D'Abrosca & Hannah Brennan, *Omar Raid Draws Ominous Warnings from Vance as He Blasts Progressive Rep's 'Rage' Toward America*, FOX NEWS (Oct. 14, 2026, 5:00 AM), https://www.foxnews.com/politics/omar-raid-draws-ominous-warning-vance-blasts-progressive-reps-rage-toward-america.

[30] Michael Williams & Katelyn Polantz, *Rep. Ilhan Omar Responds After Federal Officers Search Her Home*, CNN (Oct. 12, 2026), https://edition.cnn.com/2026/10/12/politics/ilhan-omar-search.

Prominent Democrats defended Rep. Omar and questioned the legal validity and propriety of the investigation.[31] House Democratic leaders issued a statement that the raid was "deeply disturbing and raises serious questions about the continued corrupt weaponization of the federal government against [the president's] adversaries."[32] The statement also sharply criticized the Trump Administration for bringing its "violent mass deportation machine" to the home of a sitting Congresswoman fewer "than 30 days until the midterm election."[33]

## ARGUMENT

### I. THE COURT SHOULD PERMIT THE TIMES TO INTERVENE FOR THE LIMITED PURPOSE OF SEEKING ACCESS TO THE SEALED RECORDS

The Supreme Court has held that, because the public has a right of access to judicial records and proceedings, "representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion." *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 609 n.25 (1982) (cleaned up). Consistent with this decision, this circuit and others have held that third parties, including news organizations, may intervene in cases "for the limited purpose of seeking access to materials that have been shielded from public view either by seal or by a protective order." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998); *U.S. v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) (holding "that a motion to intervene to assert the public's First Amendment right of access to criminal proceedings is proper") (citation omitted). The Court should, therefore, grant The Times's motion to intervene in this action for the limited purpose of seeking access to judicial records. *E.g.*, *True the Vote, Inc. v. IRS*, 2024 U.S. Dist. LEXIS 97502,

---

[31] Maya Yang, *Democrats Rebuke Federal Raid of Ilhan Omar's Home: 'Rogue Abuse of Power'*, THE GUARDIAN (Oct. 12, 2026, 1:57 PM), https://www.theguardian.com/us-news/2026/oct/12/democrats-reaction-ilhan-omar-federal-raid-home-trump.

[32] *Id.*

[33] *Id.*

at *15 (D.D.C. May 31, 2024) (granting news organization leave to intervene for such purpose); *In re Application of Chodiev*, 2021 U.S. Dist. LEXIS 90103, at *9–10 (D.D.C. Mar. 23, 2021) (same).

## II. THE COMMON LAW RIGHT OF ACCESS REQUIRES THE SEARCH WARRANT RECORDS TO BE UNSEALED

Public access to judicial records and proceedings is a cornerstone of our judicial system. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). Here, there is a strong imperative in favor of releasing the Search Warrant Records so that "the public [can] participate in and serve as a check upon" their government. *Globe Newspaper Co.*, 457 U.S. at 606. Indeed, this case implicates all three branches of the federal government: the executive branch that is carrying out the investigation, the sitting member of Congress accused of immigration fraud, and the Court that signed off on the search warrant. The propriety and legality of the search warrant is being fiercely debated by Rep. Omar, the Trump Administration and their respective supporters. And this debate is taking place with less than three weeks to go before the midterm elections. It is undeniable that the public has an immense interest in seeing the Search Warrant Records that gave rise to the "unprecedented" raid on a sitting Congresswoman's home three weeks before an election.

Under these circumstances, the common law mandates the immediate disclosure of the sealed Search Warrant Records. "[W]hether a document must be disclosed pursuant to the common law right of access involves a two-step inquiry." *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996). *First*, "the court must decide whether the document sought is a public record." *Id.* (internal quotation marks omitted). *Second*, "the court should proceed to balance the government's interest in keeping the document secret against the public's interest in

disclosure." *Id.* (internal quotation mark omitted). Both prongs of the common law test are satisfied here.

**A. The Common Law Right of Access Applies to the Search Warrant Records**

The Search Warrant Records are indisputably subject to the common law right to "inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted). Indeed, in *In re N.Y. Times*, the government expressly acknowledged that "there is a common law right of access to warrant materials" subject to the common law presumption of access. 585 F. Supp. 2d 83, 89 n.8 (D.D.C. 2008) (holding that "the routine practice is to make warrant materials publicly available after a search has been executed and a return is available"). Consistent with the *In re N.Y. Times* decision, courts in this Circuit and across the country have regularly reached the same conclusion on the basis that these materials are "central to a court's probable cause determination." *In re Application of WP Co.*, 201 F. Supp. 3d. 109, 121 (D.D.C. 2016) (holding that "warrant applications and receipts are routinely filed with the clerk of court without seal"); *see also In re Boston Herald, Inc.*, 321 F.3d 174, 194 n.9 (1st Cir. 2003); *In re Search Warrant*, 2000 WL 1196327, at *2 (D.D.C. July 24, 2000); *In re: Search Warrants Issued on May 21, 1987*, 1990 U.S. Dist. LEXIS 9329, at *3 (D.D.C. July 26, 1990). This Court should reach the same conclusion regarding the Search Warrant Records sought by The Times.

**B. The *Hubbard* Factors Mandate Disclosure of the Search Warrant Records**

As to the second step of the inquiry, courts in this circuit apply the test laid out in *U.S. v. Hubbard*, which requires weighing six "generalized" factors, 650 F.2d 293, 317 (D.C. Cir. 1980). The *Hubbard* factors include "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests

asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." *In re Leopold*, 300 F. Supp. 3d. 61, 81 (D.D.C. 2018). "The *Hubbard* test is the D.C. Circuit's 'lodestar because it ensures that we fully account for the various public and private interests at stake.'" *Id.* (citing *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 666 (D.C. Cir. 2017) (collecting citations)). Each of these factors overwhelmingly weigh in favor of disclosure.

As to the first factor, the need for public access is at its zenith because the case involves a highly publicized criminal investigation into a sitting Congresswoman in the immediate run up to midterm elections. "The presumption of transparency is 'accentuated in cases' like this one 'where the government is a party.'" *In re Press Application for Access to Jud. Recs. in Case No. 23-SC-31 ("In re Press App.")*, 704 F. Supp. 3d 161 (D.D.C. 2023) (citing *U.S. v. All Assets Held at Bank Julius Baer & Co.*, 520 F. Supp. 3d 71, 81 (D.D.C. 2020)). "Indeed, the public has a strong interest in monitoring not only functions of the courts but also the positions that its elected officials and government agencies take in litigation." *Hyatt v. Lee*, 251 F. Supp. 3d 181, 184 (D.D.C 2017) (citing *Doe v. Pub. Citizen*, 749 F.3d 246, 271 (4th Cir. 2014)). Here, all three branches of government are implicated: a sitting member of Congress is the target of the executive branch's criminal investigation that was signed off on by the judiciary. Oversight is especially critical here as "public attention can act as a strong corrective to government abuses of power," *In re Press App.*, 704 F. Supp. 3d at 170, and fortify confidence in our institutions. This is particularly true in the light of the fact that the Trump Administration's actions are at odds with the Justice Department's longstanding policy of not taking overt actions against politicians within 60-days of an election and have been criticized by Rep. Omar as "political intimidation." The public interest in the Search Warrant Records is further heightened by the fact that both sides continue to make

public statements characterizing the investigation as either valid or a sham, which cannot be sensibly understood without access to the underlying Search Warrant Records.

Separately, the Search Warrant Records are of intense public interest because this investigation concerns the integrity of elected officials and, therefore, the First Amendment interests in disclosure are at their absolute highest. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) ("[I]t can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office."); *Mills v. Alabama*, 384 U.S. 214, 218–19 (1966) ("[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates . . . and all such matters relating to political processes."); *see also Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression . . . ."). In short, the public need for the Search Warrant Records could not be higher and is beyond dispute.

The second factor, which looks to the extent of prior access, likewise weighs in favor of disclosure. Here, "much of the critical information is already in the public forum." *In re N.Y. Times*, 585 F. Supp. 2d at 92. There has been extensive reporting on the search of Ms. Omar's residence and the execution of the warrant, which was publicly acknowledged by the Justice Department and other executive branch officials from President Trump on down. The raid was captured and broadcast by news cameras. It has been widely reported that the search warrant listed a series of potential immigration crimes under investigation, including the making of false statements and fraud in immigration paperwork, as well as a general conspiracy charge. And The Times has

reported that the warrant was issued only after a "back and forth" before this Court over its constitutionality. The fact that the circumstances surrounding the Search Warrant Records are public knowledge already weighs heavily in favor of disclosure. *See L.A. Times Commc'ns v. U.S.*, 28 F.4th 292, 298 (D.C. Cir. 2022) (holding that "extensive media reporting relating to the Justice Department investigation, including Senator's own acknowledgement of the investigation" was grounds for reversal of district court's decision denying unsealing request of search warrant).

Courts have held that the third, fourth, and fifth factors "ask variations of the same question: to what extent harm to legitimate interests, including privacy or law enforcement interests, would result from unsealing." *In re Application of L.A. Times Commc'ns to Unseal Ct. Records*, 628 F. Supp. 3d 55, 66 (D.D.C. 2022) (cleaned up). The fact that the investigation remains ongoing does not tip in favor of continued sealing. Any risk of impairing law enforcement interests is minimal because the executive branch has repeatedly told the public that Rep. Omar and her family are under investigation. There is also no doubt that the Search Warrant Materials relate to that investigation. And the typical concerns about protecting an ongoing investigation—tipping off targets or those who might dispose of evidence—ceased to exist from at least March 2026, when Vice President Vance announced the investigation on a podcast. *See Search Warrant Dated October 13, 2023*, 2023 U.S. Dist. LEXIS 188837, at *10 (S.D.N.Y. Oct. 20, 2023) (unsealing warrant affidavit despite ongoing investigation because "the Government's investigation is public"). In the unlikely event that the Court finds that there are lingering privacy interests relating to genuinely confidential and private information, narrow redactions are the appropriate remedy. *In re Application of L.A. Times*, 628 F. Supp. 3d at 66–69; *see also infra* Section III.B.

Finally, as to the sixth factor, "[w]hen a sealed document is considered as part of judicial decision-making, the sixth factor will oftentimes carry great weight." *CNN v. FBI*, 984 F.3d 114,

120 (D.C. Cir. 2021). Here, the Search Warrant Records were "'central to the court's probable cause determination' and consequently weigh heavily in favor of disclosure." *In re Application of L.A. Times*, 628 F. Supp. 3d at 69 (cleaned up).

In light of the overwhelming weight in favor of disclosure, the Court should unseal the Search Warrant Records.

## III. THE FIRST AMENDMENT RIGHT OF ACCESS REQUIRES THE SEARCH WARRANT RECORDS TO BE UNSEALED

The First Amendment guarantees the press and the public access court proceedings and records, 'if such access has historically been available, and serves an important function of monitoring prosecutorial or judicial misconduct.'" *U.S. v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997) (quoting *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991)). Accordingly, when determining whether the First Amendment right of access applies to a particular judicial proceeding or record, courts look to two "complementary" and "related" considerations: "experience and logic." *Press-Enterprise Co. v. Superior Court ("Press-Enterprise II")*, 478 U.S. 1, 8–9 (1986). Specifically, the First Amendment right of access applies where (1) "the place and process have historically been open to the press and general public," and (2) "public access plays a significant positive role in the functioning of the particular process in question." *Id.*

### A. The First Amendment Right of Access Applies to the Search Warrant Records

The Search Warrant Records are subject to the First Amendment right of access under the "experience and logic" test. As the court articulated in *In re N.Y. Times*, "warrant materials . . . have historically been available to the public, and therefore meet the first prong of the Supreme Court's First Amendment qualified right of access test." 585 F. Supp. 2d at 88–89 (citing Fed. R. Crim. P. 41(i) (warrant materials should be delivered to the clerk in the district where the property was seized); *Times Mirror Co. v. U.S.*, 873 F.2d 1210, 1214 (9th Cir. 1988) ("[M]ost search

warrant materials routinely become public . . . ."); *Baltimore Sun Co.v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989) ("Frequently-probably most frequently-the warrant papers including supporting affidavits are open for inspection by the press and public in the clerk's office after the warrant has been executed.")).

The "logic" factor likewise weighs strongly in favor of a First Amendment right of access because "with respect to warrants, openness plays a significant positive role in the functioning of the criminal justice system." *In re N.Y. Times*, 585 F. Supp 3d at 90. Specifically, the Search Warrant Records sought by The Times are critical "to the public's understanding of the function and operation of the judicial process and the criminal justice system and may operate as a curb on prosecutorial or judicial misconduct." *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988); *see also In re N.Y. Times*, 585 F. Supp 3d at 90 (holding that "warrant materials are often used to adjudicate important constitutional rights such as the Fourth Amendment protection against unreasonable searches and seizures," and that "[p]ublic access to warrant materials serves as a check on the judiciary because the public can ensure that judges are not merely serving as a rubber stamp for the police"). The need for oversight is particularly strong here because the conduct of the investigation has been irregular in multiple respects: high-ranking members of the Trump administration stated their conviction that Rep. Omar was guilty before the investigation began, the presiding judge raised constitutional concerns, the search warrant was executed publicly in contravention of a Department of Justice policy not to engage in overt acts against candidates in the 60-day window before an election and the wife of President Trump's Deputy Chief of Staff (herself a prominent podcaster) celebrated the raid by posting "promises made, promises kept."

**B. There Are No Compelling Interests That Override the First Amendment Right of Access to the Search Warrant Records**

Where the First Amendment right of access attaches, any party seeking to prevent disclosure must show that sealing serves a compelling governmental interest and is narrowly tailored to serve that interest. *Globe Newspaper Co.*, 457 U.S. at 606–07. As the Supreme Court has explained, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure was properly entered." *Press-Enterprise Co. v. Super. Ct.*, 464 U.S. 501, 509–10 (1984). The D.C. Circuit has articulated this standard as a three-prong test, where the presumption of access can be overcome only if the party opposing disclosure shows that "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Robinson*, 935 F.2d at 290 (citation omitted). This test cannot be met here and the Search Warrant Records must be unsealed.

The fact that the criminal investigation is ongoing cannot justify wholesale sealing of the Search Warrant Records. While some courts have recognized that the government has a legitimate interest in maintaining the integrity of its investigation and that the case for access is strongest after a case has been concluded (*see, e.g.*, *In re Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990)), unsealing decisions must be made on a case-by-case basis. In making this determination, courts have recognized that "the presumption in favor of public access is especially strong" where a case involves "a matter of significant public concern," *In re Motion to Intervene & Unseal Search Warrant Records*, 2025 U.S. Dist. LEXIS 178461, at *4 (D. Md. Sept. 12, 2025), or where unsealing would "promote understanding of historically significant events." *In re*

*Warrant*, 622 F. Supp. 3d 1257, 1264 (S.D. Fla. 2022). Here, the typical concerns about protecting an investigation—tipping off targets or those who possess evidence—ceased to exist when the executive branch publicly announced that Rep. Omar was under investigation for immigration fraud and other charges. The unsealing of entire documents is appropriate under these circumstances. *See Search Warrant Dated October 13, 2023*, 2023 U.S. Dist. LEXIS 188837, at *10 (unsealing warrant affidavit despite ongoing investigation because "the Government's investigation is public"); *Sealed Search Warrants Issued June 4 & 5, 2008*, 2008 U.S. Dist. LEXIS 107711, at *14 (N.D.N.Y. July 14, 2008) (granting access to certain warrants while investigation was ongoing). But, even if the Search Warrant Materials contain some legitimately sensitive and non-public details relating to the ongoing investigation, the appropriate remedy is limited redactions and not blanket sealing. *See, e.g.*, *In re Motion to Intervene & Unseal Search Warrant Records*, 2025 U.S. Dist. LEXIS 178461, at *6 (finding that "the government's proposed redactions to the search warrant records are narrowly tailored to the Government's interest in maintaining the integrity of its investigation").

Additionally, Rep. Omar's privacy interests cannot justify the sealing of the Search Warrant Records. Courts have regularly held that "privacy and reputational concerns typically don't provide sufficient reason to overcome a qualified First Amendment right of access." *U.S. v. Loughner*, 769 F. Supp. 2d 1188, 1196 (D. Ariz. 2011) (citing *In re N.Y. Times*, 585 F. Supp. 2d at 93 n.14); *see also In re McClatchy Newspapers, Inc.*, 288 F.3d 369, 374 (9th Cir. 2002) (stating in a common law right of access case that "injury to official reputation is an insufficient reason for repressing speech that would otherwise be free")); *see also In re Special Proceedings*, 842 F. Supp. 2d 232, 245 (D.D.C. 2012) (holding that prosecutors' "privacy and reputational interests" did not constitute a "compelling interest that would meet their high burden to justify keeping the Report

[of an investigation into possible prosecutorial misconduct] under seal" under First Amendment)). Indeed, this privacy interest is further diminished by the fact that there has already been significant reporting about the execution of the search warrant at Rep. Omar's home—including vociferous public statements from Rep. Omar and her allies in Congress denouncing the investigation as an act of "political intimidation." *See e.g., Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (politician waived right to have his name redacted from responsive documents regarding events he publicly discussed). Finally, narrowly tailored redactions may also address any legitimate privacy concerns raised by the Search Warrant Records.

In sum, the presumption of openness cannot be overcome because none of the three factors can possibly support continued wholesale sealing of the Search Warrant Records. Given that the executive branch and Rep. Omar have already said so much about the investigation in public, no compelling interest in secrecy exists, and no harm to this non-existent interest could arise from unsealing. To the contrary, unsealing the Search Warrant Records would serve a compelling interest in informing the public about the judicial proceedings that culminated in the highly publicized and hotly debated raid on Rep. Omar's house in the leadup to an election.

## CONCLUSION

For the foregoing reasons, The Times respectfully requests that the Court grant its motion to intervene and their application and promptly unseal the Search Warrant Records.

Dated: October 14, 2026

Respectfully submitted,

*/s/ Dana R. Green*
Dana R. Green (#1005174)
John M. Browning (*pro hac vice* forthcoming)
Alexandra M. Settelmayer (*pro hac vice* forthcoming)
Courtney C. Douglas (*pro hac vice* forthcoming)

The New York Times Company
620 8th Avenue
New York, NY 10018
Telephone: (212) 556-5290
Facsimile: (212) 556-4634
dana.green@nytimes.com
jack.browning@nytimes.com
alexandra.settelmayer@nytimes.com
courtney.douglas@nytimes.com

*Counsel for The New York Times Company*